

FILED

Dec 16 2015, 8:43 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEYS FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Andrew M. McNeil<br>Philip R. Zimmerly<br>Bose McKinney & Evans LLP<br>Indianapolis, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Frances Barrow<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Circle Health Partners, Inc., <br><br>*Appellant-Employer,* <br><br>v. <br><br>Unemployment Insurance Appeals of the Indiana Department of Workforce Development, <br><br>*Appellee-Claimant.* | December 16, 2015 <br><br>Court of Appeals Case No. 93A02-1503-EX-183 <br><br>Appeal from the Final Judgment of the Indiana Department of Workforce Development <br><br>The Honorable Aija Funderburk, Liability Administrative Law Judge <br><br>Case No. 67702 |

**May, Judge.**

[1] Circle Health Partners, Inc., ("CHP") appeals the decision of the Liability Administrative Law Judge ("LALJ") that certain workers were employees of

CHP, rather than independent contractors, such that CHP's payments to those workers were "wages" as defined in Ind. Code § 22-4-4-2 for which CHP was liable to the State of Indiana for additional unemployment taxes.

We affirm.

## Facts and Procedural History

In 2013, the Department of Workforce Development (the Department) undertook an audit of CHP's business and tax records. It determined CHP "had additional taxable wages in 2009, 2010, and 2011 based on payments made to individuals for services that constituted employment." (App. at 3.) CHP filed a timely protest of those Findings.

An LALJ conducted a hearing in January 2015 and, thereafter, entered an order that affirmed the Department's decision. That order included the following findings of fact:

> [CHP] is a pre-claim cost control consulting business located in Indianapolis, Indiana and serves clients in various states. [CHP]'s typical clients are employers that provide health insurance benefits to their employees. [CHP] creates strategies for its clients to reduce healthcare costs and save lives. [CHP]'s mission is to "lead our country in pre-claim cost control strategies[;] [d]eliver truly integrated health and wellness strategies that save lives and impacts [sic] the bottom line for our clients[; and] [c]hange the corporate health delivery model so that employers and members can focus on their core business and success." *See* Department's Ex. 4.

[CHP] generally offers its clients wellness programs, pharmaceutical benefit management, administration, reporting, and a web portal to achieve its mission goals. [CHP]'s pharmaceutical benefit management includes identifying medications that the employer makes available to its employees and finding lower cost alternatives or substitutions for those medications. [CHP] uses a web portal to obtain confidential information and data to develop and implement its cost control strategies. [CHP] also offers the web portal to its clients to communicate with their employees. [CHP] reports data and information to its clients and provides administrative services.

[CHP] designs wellness programs for its clients after a consultation with top executives to determine the work environment and culture and the goals for the program. Typically, [CHP] offers three strategies as part of its wellness programs: awareness, education and motivation. With respect to awareness, [CHP] uses data from a questionnaire and health screenings to help an individual understand where they [sic] are on the health spectrum and to analyze its clients' employees' highest risk areas. Through the education component of the wellness programs, [CHP] offers seminars, e-learning, lifestyle management programs, and a web portal health encyclopedia to its clients and their employees. [CHP] uses a motivation strategy in its wellness programs to encourage health and cost control by providing incentives, rewards and coaching to its clients' employees.

As stated, [CHP] uses data from health screenings to implement the awareness strategy of its wellness programs. As part of its wellness services, [CHP] regularly offers health screenings to its clients. *See* Department's Ex. 4. Depending on a client's needs and/or budget, [CHP] conducts health screenings at the client's facility for an additional cost. In some cases, clients choose not to use the health screenings at all. In other cases, clients may choose to have another entity perform a health screening or

perform their own health screenings. For example, in 2010, approximately 7,000 of [CHP]'s 49,000 covered individuals had a health screening completed by [CHP].

When [CHP] performs the health screenings, [CHP] hires licensed registered nurses and certified phlebotomists to do so. [CHP] also hires licensed nurses to conduct personal consultations to discuss the results of a questionnaire and biometric screening with its clients' employees, when that service is selected by the client. [CHP] generally hires nurses that are employed by other entities, such as hospitals and, typically, finds them by word of mouth. *See* Department's Ex. 3. [CHP] is unaware as to whether the nurses and phlebotomists offer services to other entities as independent contractors.

\* \* \* \* \*

The Department conducted an audit of [CHP]'s business for years 2009, 2010 and 2011. As part of the audit process, Steve Husk, President/Principal, completed a Compliance Audit Questionnaire. *See* Department's Ex. 2. On the questionnaire, Mr. Husk described [CHP]'s business activity as "WELLNESS CONSULTING, PROGRAM SCREENING & CONSULTATION[,] WEB TOOL SUPPORT SERVICES[.]" Department's Ex. 2. In addition, Mr. Husk communicated with the auditor, Tracy Robbins, via email to explain [CHP]'s business and the services that individuals that received 1099 tax forms provided. *See* Department's Ex. 3.

In the email, Mr. Husk explained that [CHP] uses the services of registered nurses, certified phlebotomists, and wellness professionals in the delivery of its on-site wellness service to its clients. Mr. Husk also stated that "if [CHP] could not rely on [registered nurses, certified phlebotomists, and wellness professionals] to execute the on-site wellness program, [CHP]

would not offer that service and instead would limit its business to expert wellness consulting and web-based programs." Department's Ex. 3 at p3.

(*Id*. at 3-5.)  The LALJ concluded:

1.      The [LALJ] has jurisdiction over this matter pursuant to Indiana Code §22-4-32-1. *et. seq.*

2.      The [LALJ] concludes that the nurses and phlebotomists at issue were not free from direction and control in contract and in fact.

3.      The [LALJ] concludes that the services that the nurses and phlebotomists performed were not outside the usual course of [CHP]'s business.

4.      The [LALJ] concludes that the nurses and phlebotomists were customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the service performed.

5.      Accordingly, the [LALJ] concludes the services provided by the nurses and phlebotomists at issue constitute employment and that payments made to those individuals as remuneration for those services constitute wages.

(*Id*. at 5-6.)

# Discussion and Decision

"Any decision of the liability administrative law judge shall be conclusive and binding as to all questions of fact."  Ind. Code § 22-4-32-9(a) (1995).  However

we "are not bound by an agency's interpretation of the law." *Jug's Catering, Inc. v. Indiana Dep't. of Workforce Dev., Unemployment Ins. Bd.*, 714 N.E.2d 207, 210 (Ind. 1999), *trans. denied*. When a party challenges an administrative law judge's decision as contrary to law, we may consider "both the sufficiency of the facts found to sustain the decision, and the sufficiency of the evidence to sustain the finding of facts." Ind. Code § 2-4-32-12 (1990). When undertaking our review, we must look at the record in the light most favorable to the administrative decision, and we may neither reweigh the evidence nor assess the credibility of the witnesses. *Jug's Catering*, 714 N.E.2d at 209. "Under this standard, basic facts are reviewed for substantial evidence, conclusions of law are reviewed for their correctness, and ultimate facts[1] are reviewed to determine whether the ALJ's finding is a reasonable one." *Bloomington Area Arts Council v. Dep't of Workforce Dev., Unemployment Ins. Appeals*, 821 N.E.2d 843, 849 (Ind. Ct. App. 2005) (footnote added).

[6] Circle Health argues the LALJ erred by determining the nurses and phlebotomists are employees of CHP within the meaning of Ind. Code § 22-4-8-1. For purposes of determining when an employer is liable for unemployment taxes, employment means "service . . . performed for remuneration or under any contract of hire, written or oral, expressed or implied." Ind. Code § 22-4-8-1(a). Any service

---

[1] "Ultimate facts are conclusions or inferences from the basic facts." *Bloomington Area Arts Council v. Department of Workforce Dev., Unemployment Ins. Appeals*, 821 N.E.2d 843, 849 (Ind. Ct. App. 2005).

performed by an individual for remuneration shall be deemed to be employment subject to this article irrespective of whether the common-law relationship of master and servant exists, unless and until all the following are shown to the satisfaction of the department:

(1) The individual has been and will continue to be free from control and direction in connection with the performance of such service, both under the individual's contract of service and in fact.

(2) The service is performed outside the usual course of the business for which the service is performed.

(3) The individual:

(A) is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the service performed; or

(B) is a sales agent who receives remuneration solely upon a commission basis and who is the master of the individual's own time and effort.

Ind. Code § 22-4-8-1(b) (2006). Pursuant to that definition, all workers are presumed to be employees until an employer demonstrates all three factors. *See Bloomington Area Arts Council*, 821 N.E.2d at 849 (noting employing unit had burden of proof as to three elements). When we review a decision, we must consider those three statutory provisions "conjunctively." *Id*. Furthermore, because assessments made by the commission against "employing units [are] *prima facie* correct," Ind. Code § 22-4-29-2 (2009), CHP has the burden of

demonstrating it proved the nurses and phlebotomists at issue met all three factors in that test.

[7] The first factor that an employing unit must demonstrate to prove a worker is not an employee is that the worker is "free from control and direction in connection with the performance of such service, both under the individual's contract of service and in fact." Ind. Code § 22-4-8-1(b)(1). To meet this requirement "requires more than the mere power to have the [workers] cease their performance of the service upon a showing that such service was not being performed in the manner in which it should be performed." *Alumiwall Corp. v. Indiana Emp't Sec. Bd.*, 130 Ind. App. 535, 541, 167 N.E.2d 60, 62 (1960). Instead, the employer must exert "some control and direction over the manner, method and means in which the services are performed." *Id*. "What constitutes control and direction under the statute is a factual question. Each case must be decided upon its own particular facts." *Norman A. Boerger Ins., Inc v. Indiana Emp't Sec. Bd.*, 158 Ind. App. 154, 158, 301 N.E.2d 797, 800 (1973).

[8] The LALJ concluded "the nurses and phlebotomists at issue were not free from direction and control in contract and in fact." (App. at 5.) She explained:

> The [LALJ] notes that the reason for the service is to gather health information and to inform individuals receiving health screenings. The employer's contract, however, directs the manner and/or method by which the individuals perform the health screenings and consultations. Indeed, the Description of Services document for health screenings instructs the nurses and phlebotomists to set up the screening in an efficient manner, collect money, start discussions with client employees, show the

employees how to complete the employer's computer questionnaire, tear down and clean up the screening room, and provide customer service. *See* Department's Ex. 6.

Likewise, the Description of Services document for personal consultations requires nurses to discuss preventative tests, discuss the participant's health record and applicable company benefits, and set goals for healthier living, etc. *See* Department's Ex. 5. Per the Description of Services document, the nurse consultant is also responsible for giving out pamphlets, filling out a no show/show list, gathering contact info and goals for at risk clients and recording. The Description of Services documents do more than list information that the individuals must gather or list services; it directs the individuals on how to conduct the screenings and consultations. Therefore, the [ALJ] concludes that individuals at issue were not free from the employer's direction and control in contract.

(*Id.* at 7.) Her order also included the following pertinent findings of fact:

When the employer performs the health screenings, the employer hires licensed registered nurses and certified phlebotomists to do so. The employer also hires licensed nurses to conduct personal consultations to discuss the results of a questionnaire and biometric screening with its clients' employees, when that service is selected by the client. The employer generally hires nurses that are employed by other entities, such as hospitals and, typically, finds them by word of mouth. *See* Department's Ex. 3. The employer is unaware as to whether the nurses and phlebotomists offer services to other entities as independent contractors.

Each nurse and phlebotomist is required to sign an Independent Contractor Agreement (agreement) with the employer. Per the agreement, the nurses and phlebotomists agree to provide services listed in a Description of Services document and are paid

an hourly rate for hours worked that are billable to the employer or its clients. *See* Department's Ex. 6. The agreement also states that the nurses and phlebotomists are entitled to reimbursement for travel and other expenses incurred in providing services.

The Description of Services document for either the health screening or the personal consultation is attached to the agreement, as Exhibit A. *See* Department's Ex. 5, 6. For a health screening, nurses are to perform eighteen (18) different steps, including "Setup screening in an efficient manner[;] … Facilitate discussion of recommended tests if applicable[;] …Collect money for additional tests if applicable[;] … Measure the participant's height and weight[;] … Measure the participant's blood pressure and heart rate[;] … Direct individual as needed on how to complete the computer questionnaire[;] … Properly tear down and restore the room to before screening state; … Provide quality customer service throughout the contracted time[.]" *See* Department's Ex. 6.

For a personal consultation, nurses should review health screening results, discuss preventative tests, discuss the participant's health record and applicable company benefits, and set goals for healthier living, etc. *See* Department's Ex. 5. The consultation is also supposed to include a discussion of exercise, weight, stress, and family preventative health. The consultant is responsible for giving out pamphlets, filling out a no show/show list, gathering contact info and goals for at risk clients and recording, etc. *See* Department's Ex. 5.

(*Id*. at 4) (italics in original).

[9]    CHP argues "the undisputed evidence reveals" the workers at issue were like the workers in *Alumiwall*, 130 Ind. App. 535, 167 N.E.2d 60, and *Twin States Publ'g Co., Inc. v. Indiana Unemployment Ins. Bd*., 678 N.E.2d 110 (Ind. Ct. App.

1997), *trans. denied*, two cases in which we held LALJs incorrectly determined workers were employees. (Br. of Appellant at 10.) We disagree.

[10]     Alumiwall was a siding and roofing business that sold and supplied the materials to be attached to the exterior of buildings. After selling materials to a customer, Alumiwall contracted with an "applicator" to attach the materials to the building. 130 Ind. App. at 537, 167 N.E.2d at 60. The contracted applicator could hire as many workers as desired at whatever pay rate the applicator chose, and the applicator had complete discretion as to when and how the application was performed. *Id*. In addition, the applicator provided the tools and equipment necessary to perform the work. *Id*. at 540, 167 N.E.2d at 62. "The only restriction was that they perform such services in a good and workmanlike manner." *Id*. at 540-41, 167 N.E.2d at 62. We held the right to have the applicators cease work if the service was not being done in a workmanlike manner was not the statutory "direction and control" over workers that made them employees because an expectation of workmanlike performance "is inherent in all services performed by one for another." *Id*. at 541, 167 N.E.2d at 62.

[11]    Twin States Publishing Company printed newspapers and shopping guides that it then hired individuals to deliver. *Twin States*, 678 N.E.2d at 111. Those individuals had approximately twenty-four hours to deliver the publications using any method or means, and they could hire others to help complete deliveries. On appeal, we reversed the LALJ's determination that those delivery people were employees for purposes of Ind. Code § 22-4-8-1 because:

> They have complete discretion over the manner, method and means of performing their work. The only restrictions are that the carriers deliver the guides by 5:00 p.m. on Tuesdays, place the guides in a dry place, and perform their services in a workmanlike manner.

678 N.E.2d at 114.

[12] The nurses and phlebotomists who contracted to work for CHP had more restrictions on them than just performing in a workmanlike manner, although they were required to so perform. (*See, e.g.*, Ex. 6 at 5) ("Provide quality customer service throughout contracted time"). They were not simply told to conduct a health screening or "collect biometric information," (*id*.), and then left to their own devices. Rather, they were given eighteen specific steps to complete. (*Id*.) Furthermore, as the first step is to "1. Setup screening in an efficient manner," (*id*.), and one of the last is to "16. Properly tear down and restore room to before screening state," (*id*.), one could reasonably infer the eighteen steps are listed in the order they are to be completed during the health screening. The workers in *Alumiwall* and *Twin States* could hire others to complete the contracted work for them, but there is no indication those contracted to work for CHP could send others to complete the work. Nor could those nurses and phlebotomists conduct the screenings at times other than the hours scheduled for the screenings. The facts in this case are not like those in *Alumiwall* and *Twin States*, and we see no error in the LALJ's conclusion the phlebotomists and nurses were not free of CHP's direction and control.

As a business must meet all three of the factors in Ind. Code § 22-4-8-1 in order to prove a worker is not an employee, CHP's inability to prove the LALJ erred as to the first factor is sufficient to require us to affirm the LALJ's decision. *See Bloomington Area Arts Council*, 821 N.E.2d at 849 (all workers presumed to be employees until employer demonstrates all three statutory factors).

## Conclusion

The evidence supports the LALJ's findings, and those findings support the LALJ's conclusion "the nurses and phlebotomists at issue were not free from direction and control in contract and in fact." (App. at 20.) Accordingly, we affirm.

Affirmed.

Crone, J., and Bradford, J., concur.