FILED

Oct 31 2017, 10:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Andrew B. Murphy
Faegre Baker Daniels LLP
Minneapolis, Minnesota

Angela N. Johnson
Faegre Baker Daniels LLP
South Bend, Indiana

Paul D. Borghesani
Law Office of Paul D. Borghesani
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Company,<br>*Appellant,*<br><br>*v.*<br><br>Indiana Department of<br>Workforce Development,<br>*Appellee.* | October 31, 2017<br><br>Court of Appeals Case No.<br>93A02-1703-EX-650<br><br>Appeal from the Indiana<br>Department of Workforce<br>Development—Unemployment<br>Insurance Appeals<br><br>The Hon. Suzanne E. Manning,<br>Liability Administrative Law Judge<br><br>Case No. 97920 |

**Bradford, Judge.**

# Case Summary

Appellant Company appeals from the determination that Claimant was an employee during the time she worked as a driver for Company, for purposes of Indiana's unemployment compensation system, as enacted in Indiana Code article 22-4 ("the Act"). Company's business is the provision of driveaway services, focusing on the delivery of recreational vehicles ("RVs") to dealerships on behalf of manufacturers. To that end, Company uses drivers it classifies as independent contractors, one of whom was Claimant during parts of 2014 and 2015. After no longer working for Company, Claimant applied for unemployment benefits in 2015, and Appellee the Indiana Department of Workforce Development ("DWD") concluded that Claimant had been an employee of Company for purposes of the Act. The Company filed a tax protest, and after a hearing, a Liability Administrative Law Judge ("LALJ") agreed that Claimant had been an employee. Company contends that (1) the LALJ erroneously determined that Claimant had been an employee and (2) operation of the Act is preempted by the Federal Aviation Administration and Authorization Act ("FAAAA"). Because we disagree, we affirm.

# Facts and Procedural History

Company is in the business of pairing drivers with manufacturers who require driveaway services, focusing on arranging the transportation of RVs to dealerships. Claimant is a professional driver who has held a commercial driver's license since 1997. On April 8, 2014, Claimant entered into a contract

with Company to deliver RVs ("the Contract"), which provides, in part, as follows:

> WHEREAS, Carrier does not employ and/or retain any individuals to provide driveaway services for the movement of motor vehicles over the road, outsourcing this responsibility to self-employed third parties with the required knowledge and skills as well as license to drive/operate commercial motor vehicles.
>
> WHEREAS, the Contractor is a self-employed individual engaged in the business of providing over the road driving services, as a sole proprietor and independent contractor, to various motor carriers and/or manufacturing companies for the pickup, driving and/or operation of commercial motor vehicles and delivery including the maintenance, inspection and/or minor repair while the commercial motor vehicle is in the care, custody, and control of Contractor, on a trip to trip basis, (the "Services") pursuant to Contracts and/or Agreements with the described companies; and
>
> WHEREAS, the Carrier and Contractor desire to enter into this Agreement to utilize and provide, respectively, the Services on a trip to trip arrangement, in an Independent Contractor relationship and nothing in this Agreement shall be construed as inconsistent with such status.

Ex. Vol. IV p. 23. Claimant performed work for Company from April 1, 2014, through March 13, 2015.

[3] On March 19, 2015, Company was notified by DWD that Claimant had filed for unemployment benefits with the Missouri Department of Labor & Industrial Relations. On May 20, 2015, DWD issued a "Determination of Wage Investigation" in which it concluded that Company had misclassified Claimant's wages. DWD concluded that Claimant had been an employee of

Company—not an independent contractor—and that Company was therefore liable for the payment of unemployment insurance tax for Claimant's tenure. On June 8, 2015, Company filed an unemployment insurance tax protest with DWD.

[4] On March 1, 2017, the LALJ heard evidence during a telephonic hearing on Company's tax protest. On March 7, 2017, the LALJ issued its decision on Company's appeal, which included, among others, the following findings of fact:

> The employer is a registered motor carrier with the Department of Transportation (DOT). The employer's DOT number is 273286. The employer's business is transportation of property, including recreational vehicles (also known as RVs) in interstate and intrastate commerce. The employer purchases driving services with manufacturers. The employer does not employ any individual to provide delivery of RV[]s. Department's Exhibit 5. Rather, the employer contracts with individuals, such as the claimant, to provide delivery service. In addition, the employer has a broker's license to subcontract with other motor carriers to provide delivery of RVs.

Ex. Vol. IV pp. 80-81. The LALJ concluded that, pursuant to the test detailed in Indiana Code section 22-4-8-1 of the Act, Claimant had been an employee of Company starting in 2014 and was therefore entitled to receive unemployment benefits related to her work. The LALJ concluded, in part, that

> the employer failed to establish that the claimant was performing work that was outside of the usual course of the employer's business. The employer's business is transportation of property, specifically RVs, in interstate and intrastate commerce. The employer does not employ[] any persons to do this work; rather,

the employer chooses to use contractors, such as the claimant, to provide this service. The employer has a broker's license with the DOT to contract with a different motor carrier to provide the service. The employer could not perform the transportation of the property without contractors or subcontracting the work to another motor carrier. The claimant's work was within the usual course of the employer's business.

The Liability Administrative Law Judge concludes the services provided by the claimant constitute employment for purposes of unemployment insurance law. The employer's protest is DENIED. The Determination of Wage Investigation is AFFIRMED.

Ex. Vol. IV p. 83.

# Discussion and Decision

## I. Whether the LALJ's Conclusion that Claimant was an Employee is Reasonable

[5] While most of the facts related to this question are essentially undisputed, the Company does dispute the LALJ's conclusion that Claimant was an employee in 2014 and 2015.

> "Any decision of the liability administrative law judge shall be conclusive and binding as to all questions of fact." Ind. Code § 22-4-32-9(a) (1995). However we "are not bound by an agency's interpretation of the law." *Jug's Catering, Inc. v. Indiana Dep't of Workforce Dev., Unemployment Ins. Bd.*, 714 N.E.2d 207, 210 (Ind. App. 1999), *trans. denied*. When a party challenges an administrative law judge's decision as contrary to law, we may consider "both the sufficiency of the facts found to sustain the decision, and the sufficiency of the evidence to sustain the finding of facts." Ind. Code § 2-4-32-12 (1990). When undertaking our review, we must look at the record in the light most favorable to

the administrative decision, and we may neither reweigh the evidence nor assess the credibility of the witnesses. *Jug's Catering*, 714 N.E.2d at 209. "Under this standard, basic facts are reviewed for substantial evidence, conclusions of law are reviewed for their correctness, and ultimate facts are reviewed to determine whether the ALJ's finding is a reasonable one." *Bloomington Area Arts Council v. Dep't of Workforce Dev., Unemployment Ins. Appeals*, 821 N.E.2d 843, 849 (Ind. Ct. App. 2005)[.]

*Circle Health Partners, Inc. v. Unemp't Ins. Appeals of Ind. Dep't of Workforce Dev.*, 47 N.E.3d 1239, 1242 (Ind. Ct. App. 2015) (footnote omitted).

[6] Indiana Code section 22-4-8-1(1)(b) provides that, for purposes of the Act, the following applies:

> (b) Services performed by an individual for remuneration shall be deemed to be employment subject to this article irrespective of whether the common-law relationship of master and servant exists, unless and until all the following conditions are shown to the satisfaction of the department:
> > (1) The individual has been and will continue to be free from control and direction in connection with the performance of such service, both under the individual's contract of service and in fact.
> > (2) The service is performed outside the usual course of the business for which the service is performed.
> > (3) The individual:
> > > (A) is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the service performed.

[7] Subsections (1)(b)(1), (1)(b)(2), and (1)(b)(3)(A) make up the three prongs of what is referred to as the "ABC" or "1-2-3" test. *See Bloomington Area Arts Council*, 821 N.E.2d at 849; *see also* Ex. Vol. IV p. 81. Pursuant to this test,

which we will call the ABC test, all workers are presumed to be employees unless an employer establishes all three prongs of the ABC test. *See id.* (noting employing unit had burden of proof as to the three prongs). When we review an LALJ's decision regarding employee status, we must consider the three statutory provisions "conjunctively." *Id.* Because assessments made by DWD against "employing units [are] prima facie correct," Ind. Code § 22-4-29-2, Company has the burden of demonstrating that it established that Claimant met all three prongs.

[8] Here, the LALJ concluded that Company established prong C, or that Claimant was customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the service performed. Claimant does not dispute this conclusion. The LALJ also concluded, however, that Company failed to establish prongs A and B, that Claimant was free from Company's direction and control or was performing work that was outside the Company's usual course of business. We find the LALJ's conclusion regarding prong B to be dispositive.[1]

[9] To prevail, Company must have established that Claimant's service for it—the transport and delivery of RVs—was outside Company's usual course of business. We have little trouble concluding that Company failed to do this. Indeed, the provision of transport and delivery of RVs is not just Company's

---

[1] Because we conclude that the LALJ reasonably concluded that Company failed to establish prong B, we need not address Company's argument with respect to prong A.

usual course of business, it seems that it is its *only* course of business. Company is registered as a motor carrier with the United States DOT, its name is "\*\*\*\*\*\*\* Transport," Department's Ex. 7A, and it would compete directly with companies who offered the same service provided by drivers who were employees. Company contends that its usual course of business is not the provision of transport services, but, rather, the provision of brokerage services. While perhaps technically true, we seriously doubt that customers with RVs to transport contact Company to act as a "middle man" between them and independent haulers; they call Company to have an RV moved from point A to point B and almost certainly do not care how Company accomplishes that task. From a common-sense standpoint, the Company's business is transport, and this is the precise service that Claimant provided to Company. The LALJ's conclusion that Claimant was, therefore, an employee for purposes of the Act is reasonable. *See Bloomington Area Arts Council*, 821 N.E.2d at 852 ("The BAAC regularly offers the art classes as part of its mission to provide access to the arts in the community. The BAAC is in competition with other organizations that provide art classes and receives a substantial portion of its revenue from the art classes. Under these circumstances, we cannot say that the ALJ's finding that the art classes were an integral part of the BAAC's usual course of business is unreasonable.").

## II.  Whether Indiana Code Section 22-4-8-1 is Preempted by Federal Law[2]

[10]   Company also contends that even if we conclude (as we have) that Claimant's services constituted employment, Indiana Code section 22-4-8-1(1)(b)(2) is preempted by the FAAAA.  Company is a federally-registered motor carrier, and the FAAAA expressly preempts any state law "having the force and effect of law related to a price, route, or service of any motor carrier[.]"  49 U.S.C. § 14501(c)(1).

> It has "long been settled" that a preemption analysis begins with the presumption that federal statutes do not preempt state law. *Bond v. United States*, ⸺ U.S. ⸺, 134 S. Ct. 2077, 2088, 189 L. Ed. 2d 1 (2014).  The presumption against preemption comes from two concepts "central to the constitutional design"—the Supremacy Clause and federalism.  *See Arizona v. United States*, 567 U.S. 387, 132 S. Ct. 2492, 2500, 183 L. Ed. 2d 351 (2012).  Although the Supremacy Clause gives Congress the power to preempt state law, federalism requires that we do not easily find preemption.  *See id*. at 2501.  In fact, we find preemption only if it is "the clear and manifest purpose of Congress."  *Id*.

*Kennedy Tank & Mfg. Co. v. Emmert Indus. Corp.*, 67 N.E.3d 1025, 1028 (Ind. 2017) (footnote omitted).

[11]   Through the FAAAA, Congress has expressed a clear intent to preempt any state law that "relates to" a price, route, or service or any motor carrier; the

---

[2]  Although Company raised this issue in a written submission to DWD, the LALJ did not address it.  Rather than remand to DWD for reconsideration, we choose to address it in this appeal in the interest of judicial economy.

question before us is whether Prong B satisfies that requirement. While no Indiana court has addressed this precise FAAAA preemption question, the United States Supreme Court and several United States Circuit Courts of Appeal have, offering valuable guidance. *See, e.g.*, *Grp. Dekko Servs. LLC v. Miller*, 717 N.E.2d 967, 969 (Ind. Ct. App. 1999) ("U.S. Supreme Court decisions regarding federal questions … are binding on state court, while the decisions of lower federal courts are available for their consideration as persuasive authority.").

The Seventh Circuit case of *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1051 (7th Cir. 2016), summarizes federal jurisprudence in the area:

> The preemptive scope of the FAAAA is broad. [*See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84, 112 S. Ct. 2031, 2036 (1992)]. A state law is preempted if it has a direct connection with or specifically references a carrier's prices, routes, or services. *Id*. at 384, 112 S. Ct. 2031. More expansively, a state law may be preempted even if the law's effect on prices, routes, or services "is only indirect." *Id*. at 386, 112 S. Ct. 2031 (quotation marks omitted). This means "that pre-emption occurs at least where state laws have a 'significant impact' related to Congress' deregulatory and pre-emption-related objectives." [*Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371, 128 S. Ct. 989, 995 (2008)] (quoting *Morales*, 504 U.S. at 390, 112 S. Ct. 2031).

The *Costello* court's summary of cases from the Seventh Circuit and its sister circuits is that "[l]aws that affect the way a carrier interacts with its customers fall squarely within the scope of FAAAA preemption. Laws that merely govern a carrier's relationship with its workforce, however, are often too tenuously

connected to the carrier's relationship *with its consumers* to warrant preemption." *Costello*, 810 F.3d at 1054 (emphasis in *Costello*). Because Indiana Code section 22-4-8-1 governs Company's relationship with its workforce, the precise question presented is whether its application here has "a significant impact on the prices, routes, and services that [Company] offers to its customers." *Costello*, 810 F.3d at 1055.

[14] Company argues that classification of its drivers as employees pursuant to Indiana Code section 22-4-8-1 would, in fact, have a significant impact on the prices it must charge its customers. Specifically, Company points to its Exhibit G1, which is an analysis of what its costs would have been in 2016 to use independent contractors versus employees and is summarized here:

| | Independent Contractor | Employee |
|---|---|---|
| Miles | 22,139,177 | 22,139,177 |
| Driver Pay | $19,925,259 ($0.90/mile) | $11,955,155 ($0.54/mile) |
| Fuel Reimbursement | | $6,228,643 (8 mpg, $2.25/gallon) |
| Toll Reimbursement | | $207,555 |
| Unemployment Insurance | | $800,995 |
| Employee Benefits | | $1,044,000 |
| Tools and Hardware | | $174,000 |
| Driver Return Expense | | $11,955,155 |
| Totals | $19,925,259 | $32,363,504 |

According to Company, Exhibit G1 indicates that it would have to charge its customers an estimated additional $0.56 per mile. DWD argues, and we agree, that this claimed increase in labor costs is not supported by the evidence.

[15] Company's Exhibit G1 lists several additional expenses that it claims it would incur were drivers like Claimant to be classified as employees for purposes of the Act, including fuel reimbursement, toll reimbursement, employee benefits, tools and hardware, and driver return expenses. The *Costello* court addressed a similar claim about additional labor expenses, and we find its approach to be sound. In that case, BeavEx was a same-day delivery service who sought to make certain deductions from the wages of its couriers, who were classified by BeavEx as independent contractors. *Costello*, 810 F.3d at 1048. When couriers for BeavEx sued to be classified as employees under Illinois law (which would have rendered the wage deductions illegal), BeavEx countered that the Illinois law was preempted by the FAAAA. *Id*. BeavEx claimed, *inter alia*, that the Illinois law would have a significant effect on BeavEx's prices by subjecting it

> to numerous legal obligations toward those couriers that do not currently apply, including minimum wage, maximum hour, and overtime requirements, mandated payroll tax payments and withholding requirements, mandated workers' compensation and medical insurance, and mandated contributions to state unemployment insurance, in addition to remedies specifically requested in Plaintiffs' complaint, which include requirement [sic] BeavEx to purchase or lease, store, and maintain automobiles for its couriers.

*Id.* at 1056 (citation omitted; brackets in *Costello*). The court noted that "[c]onspicuously absent from BeavEx's parade of horrors is any citation of authority showing that it would be required to comply with this slew of federal and state laws." *Id.* In the end, the court did "not accept BeavEx's bare assertion that its couriers will need to be classified as employees for all purposes." *Id.*

[16] As BeavEx failed to do in *Costello*, Company provides us with no authority for the proposition that it would be required to treat drivers like Claimant as employees for *all* purposes, and we are aware of none. Seeing no reason to treat this situation differently than the situation presented in *Costello*, we do not accept Company's bare assertion that its drivers must be classified as employees for all purposes. Claimant's only claim is that she is entitled to be classified as an employee with respect to unemployment benefits, and that is the only question we reach.

[17] After the expenses unrelated to unemployment insurance premiums are taken out of the equation, Company has established, at most, that estimated labor costs would increase by $800,995 per year,[3] or approximately $0.036 per mile. At the Company's labor cost of $0.90 per mile, Company's Ex. G1, such an

---

[3] It is not entirely clear how Company arrived at this figure. We assume that it is an estimated contribution based on Company's assertion that it would pay "employee" drivers $0.54/mile for each delivery and return mile. Although we recognize that Company's contribution rate is lower if it is based on independent contractor wages, it does not seem that the difference would be great, and it does not affect our disposition of this case in any event.

increase is a modest 4%. Therefore, even assuming that Company charges its customers only what it pays its drivers (which, of course, it does not do), the increase of what Company charges its customers would be no more than 4%. That leaves us with the question of whether a maximum 4% increase in the prices Company charges to customers has a "significant" impact for purposes of FAAAA preemption.

[18] Review of relevant precedent reveals a clear Congressional intent that certain state laws are not to be preempted by the FAAAA despite having some impact on shipping rates. "Because 'everything is related to everything else,' [*Cal. Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335, 117 S. Ct. 832, 843 (1997)] (Scalia, J., concurring), understanding the nuances of congressional intent is particularly important in FAAAA preemption analysis." *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 643 (9th Cir. 2014).

[19] The statutory language itself explicitly excludes several types of state laws and regulations:

> (2) Matters not covered.--Paragraph (1)--
>> (A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization;

(B) does not apply to the intrastate transportation of household goods; and

(C) does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the regulation of tow truck operations performed without the prior consent or authorization of the owner or operator of the motor vehicle.

49 U.S.C. § 14501(c)(2).

[20] The Congressional Conference Report on the FAAAA elaborates on the intent behind this statutory language:

> [These provisions emphasize] that State authority to regulate safety, financial responsibility relating to insurance, transportation of household goods, vehicle size and weight and hazardous materials routing of air carriers and carriers affiliated with a direct air carrier through common controlling ownership is unchanged, since State regulation in those areas is not a price, route or service and thus is unaffected.… This list is not intended to be all inclusive, but merely to specify some of the matters which are not "prices, rates or services" and which are therefore not preempted.

H.R. Conf. Rep. No. 103-677, at 84 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1756.

[21] The Ninth Circuit has interpreted the statutory language and legislative history this way: "Congress did not intend to preempt generally applicable state transportation, safety, welfare, or business rules that do not otherwise regulate prices, routes, or services." *Dilts*, 769 F.3d at 644. Or, to put it another way, "even if state laws increase or change a motor carrier's operating costs, 'broad law[s] applying to hundreds of different industries' with no other 'forbidden

connection with prices[, routes,] and services'—that is, those that do not directly or indirectly mandate, prohibit, or otherwise regulate certain prices, routes, or services—are not preempted by the FAAAA." *Id*. at 647 (quoting *Air Transp. Ass'n of Am. v. City & Cty. of San Francisco*, 266 F.3d 1064, 1074 (9th Cir. 2001)).

[22] With this in mind, we have little trouble concluding that while even a 4% increase in labor costs may have *some* impact on the prices Company charges its customers, Company has failed to establish that the impact will be "significant." As mentioned, it seems to us that a maximum 4% increase in labor costs is modest. Second, the Act is one of general applicability, as "unemployment insurance benefits are funded by a tax contribution imposed upon Indiana employers." *Indpls. Concrete, Inc. v. Unemp't Ins. Appeals of Ind. Dep't of Workforce Dev.*, 900 N.E.2d 48, 50 (Ind. Ct. App. 2009). Companies in the transport business are not singled out by the Act; Indiana employers, no matter their business, are subject to its provisions.

[23] Third, the Act is clearly intended to maintain the welfare of Indiana workers who find themselves out of work through no fault of their own:

> Economic insecurity due to unemployment is declared hereby to be a serious menace to the health, morale, and welfare of the people of this state and to the maintenance of public order within this state. Protection against this great hazard of our economic life can be provided in some measure by the required and systematic accumulation of funds during periods of employment to provide benefits to the unemployed during periods of unemployment and by encouragement of desirable stable

employment. The enactment of this article to provide for payment of benefits to persons unemployed through no fault of their own, to encourage stabilization in employment, and to provide for integrated employment and training services in support of state economic development programs, and to provide maximum job training and employment opportunities for the unemployed, underemployed, the economically disadvantaged, dislocated workers, and others with substantial barriers to employment, is, therefore, essential to public welfare; and the same is declared to be a proper exercise of the police powers of the state. To further this public policy, the state, through its department of workforce development, will maintain close coordination among all federal, state, and local agencies whose mission affects the employment or employability of the unemployed and underemployed.

Ind. Code § 22-4-1-1. Finally, nothing in the Act directly or indirectly mandates, prohibits, or otherwise regulates certain prices, routes, or services. *Dilts*, 769 F.3d at 647. Because we conclude that Company has failed to establish that the Act would have a substantial impact on the prices it charges its customers, its operation is not preempted by the FAAAA.[4]

---

[4] Company also argues that reclassification of Claimant (and other drivers) would significantly impact the routes taken by its drivers. This argument, however, is premised on Company's assertion that a ruling in Claimant's favor will mean that she must be classified as an employee for all purposes, an assertion we have rejected. This is the same reason we conclude that Company's reliance on *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016), a case in which FAAAA preemption was found, is unavailing. In that case, unlike here, reclassification of the independent-contractor drivers as employees would have had much more impact, including requiring

> various days off, parental leave, work-break benefits, and a minimum wage[.] The employer must also track and record hours worked and amounts paid. According to the Massachusetts Attorney General, under Plaintiffs' proposed application of the Massachusetts Statute, Chapter 149 would require FedEx to pay for or reimburse all out-of-pocket expenses incurred for the benefit of FedEx such as the maintenance and depreciation of the vehicles they used to perform their services. The statute also bars the employer from excepting itself from this mandate by contract.

*Id*. at 433. Because reclassification in this case is limited to the Act, *Schwann* is easily distinguished.

# Conclusion

We conclude that the LALJ's determination that Claimant was an employee of Company when she performed services for them is reasonable. We also conclude that operation of the Act in this case is not preempted by the FAAAA. Consequently, we affirm the determination of the LALJ.

Affirmed.

May, J., and Barnes, J., concur.