



FILED
Jan 23 2019, 2:29 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 19S-EX-43

## Q.D.-A., Inc.
*Appellant*

—v—

## Indiana Department of Workforce Development
*Appellee*

Argued: September 13, 2018 | Decided: January 23, 2019

Appeal from the Indiana Department of Workforce Development,
Unemployment Insurance Appeals,
No. 93484
The Honorable Suzanne E. Manning, Liability Administrative Law Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 93A02-1703-EX-556

**Opinion by Justice Massa**

Chief Justice Rush and Justices David and Goff concur.
Justice Slaughter concurs in result.

**Massa, Justice.**

Q.D.-A. matches drivers with customers who need large vehicles driven to them. Because Q.D.-A. classified these drivers as independent contractors, it did not pay unemployment taxes for them under the Indiana Unemployment Compensation Act. The Act presumes a worker is an employee unless the employer can show three things: (A) the worker is free from the employer's control and direction, (B) the worker performs a service outside the usual course of the employer's business, and (C) the worker receives a commission or operates an independently established trade, occupation, or profession.

After a driver for Q.D.-A. filed for unemployment benefits under the Act, the Department of Workforce Development told the company that it had misclassified him as an independent contractor. But because Q.D.-A. proved the Act's three-part test, we hold that he was an independent contractor.

## Facts and Procedural History

Q.D.-A. is a business that connects drivers with customers who need too-large-to-tow vehicles driven to them. Consistent with its typical practice, Q.D.-A. contracted with a Driver to pair him with customers needing this drive-away service. Under this contract—which explicitly called him an independent contractor—Driver could choose his own hours and the routes he believed were safest and most direct, contract with Q.D.-A.'s competitors, decline any work offered by Q.D.-A., negotiate his pay for each trip, and hire other drivers to complete his deliveries if they were qualified under federal regulations. Because Q.D.-A. believed these terms made Driver an independent contractor instead of an employee, it did not pay unemployment taxes for him.

After parting ways with Q.D.-A., Driver filed for unemployment benefits with the Department of Workforce Development. Because Q.D.-A. did not pay unemployment taxes for Driver, the Department investigated to determine whether Q.D.-A. should have classified Driver as an employee. After examining their contract and speaking with Driver

and representatives from Q.D.-A., the Department analyzed their relationship under the statutory "ABC Test."

To prevail under this test, Q.D.-A. needed to show that (A) Driver was free from its control and direction, (B) Driver performed his work outside the company's usual course of business, and (C) Driver was customarily engaged in an independently established trade or business of the work performed. *See* Ind. Code § 22-4-8-1(b). After looking at all the evidence, the Department determined that Q.D.-A. failed to prove any of those three prongs. According to the Department, Driver was an employee.

Q.D.-A. protested. At a hearing before a Liability Administrative Law Judge (or LALJ), the Department's sole witness, the investigator who classified Driver as an employee, acknowledged that

- She knew nothing about Q.D.-A.'s two-day orientation or internal policies,

- She believed Q.D.-A. showed control over Driver when it required him to follow state and federal regulations,

- Driver's unilateral ability to choose how to do his job could be considered the "opposite" of control,

- It would be "very odd" for an employer to allow an employee to hire someone else to do his job, and

- Q.D.-A. acted as a "middleman" between drivers and customers.

Tr. Vol. 2, pp. 19, 22–23, 29, 31, 32, 40.

On the other hand, Q.D.-A.'s director of administration and dispatch supervisor both testified that

- Q.D.-A. provided neither direction to Driver on how he should perform his job nor evaluation of his performance,

- Q.D.-A. permitted Driver to outsource his work to other drivers,

- Driver could negotiate his pay for each trip and could work for more than one drive-away company,

- Driver paid for all incidental expenses (like lodging, meals, tolls, and fuel) and provided all equipment (like any vehicle he towed to drive back home, hitch equipment, tow bars, light connectors, safety triangles, and fire extinguishers),

- Driver could refuse any jobs offered to him with no repercussions and could call in at his convenience to see if any jobs were available,

- The primary purpose of the orientation and internal policies is "to go over the regulations brought on by the federal government,"

- Q.D.-A. only employs individuals to "pair the customer with the contractor,"

- Although Q.D.-A. registered as a motor carrier with the federal government and has a Department of Transportation (DOT) number, it is "very common" in the industry for "contractors [to] contract with a motor carrier or the middle man who has the DOT number,"

- All drive-away companies must comply with federal regulations, and

- Driver was personally liable to follow federal regulations.

Tr. Vol. 2, pp. 42–53, 66–67, 70, 74, 76, 80, 85.

After the hearing, the LALJ affirmed the Department's classification, concluding that even though Q.D.-A. had established that Driver ran an independently established business, it had failed to prove the two other prongs. First, the LALJ reasoned, Q.D.-A. controlled Driver because it provided "a two-day orientation to its independent contractors," trained them on federal regulations and employer policies, and required them to perform a driving test. Ex. Vol. 4, p.102. And second, the LALJ opined, Driver performed work within Q.D.-A.'s usual course of business because

Q.D.-A. "is a provider of one-way transportation of commodities" and "[t]he independent contractors provide those services to the clients on behalf of the employer." *Id.*

Q.D.-A. appealed, and a divided panel of our Court of Appeals reversed, holding that Q.D.-A. satisfied the ABC Test. *Q. D.-A., Inc. v. Indiana Dep't of Workforce Dev.*, 96 N.E.3d 620, 627 (Ind. Ct. App. 2018), *vacated*. First, the majority determined, Q.D.-A.'s "one-time orientation session" and "incorporation of federal regulations" into its policies did "not demonstrate the kind of ongoing control over work methods needed to show control and direction." *Id.* at 626. Second, Q.D.-A. and Driver offered "complementary" yet distinct services because, the majority reasoned, Q.D.-A. "functions as an intermediary or middleman" when it employs people to pair customers and drivers. *Id.* at 627. And third, the majority noted, neither party disputed the LALJ's finding that Driver "was customarily engaged in an independently established trade, occupation, profession, or business of transporting commodities." *Id.*

The dissent pointed to another Court of Appeals opinion seemingly in conflict with the panel's decision here. *Id.* at 627–29. *See Company v. Indiana Dep't of Workforce Dev.*, 86 N.E.3d 204, 209 (Ind. Ct. App. 2017) (holding that an LALJ's conclusion that a drive-away driver was an employee of a company was reasonable). Since we agree that "[t]he Court of Appeals has entered a decision in conflict with another decision of the Court of Appeals on the same important issue," Ind. Appellate Rule 57(H)(1), we grant the Department's petition to transfer. In resolving this conflict in decisions, we also reverse the LALJ.

## Standard of Review

Under the Unemployment Compensation Act, "[a]ny decision of the liability administrative law judge shall be conclusive and binding as to all questions of fact." I.C. § 22-4-32-9(a) (2018). But when challenged as contrary to law, we review the LALJ's decision for the "sufficiency of the facts found to sustain the decision" and the "sufficiency of the evidence to sustain the finding of facts." I.C. § 22-4-32-12 (1990). Under this standard, we review an LALJ's (1) findings of basic fact to ensure "substantial

evidence" supports those findings, (2) conclusions of law for correctness, and (3) inferences or conclusions from basic facts, often called "mixed questions of law and fact," for reasonableness. *McClain v. Review Bd. of Indiana Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1317–18 (Ind. 1998).

Since the LALJ's conclusion of whether Driver met the ABC Test is a mixed question of law and fact, we review it for reasonableness. And because deciding whether a worker is an employee or independent contractor falls within the special competence of the Department, we show "greater deference" to the reasonableness of the Department's determination. *Id.* at 1318. But even when showing this heightened deference, we will not blindly sustain the determination of the Department and will reverse "if the underlying facts are not supported by substantial evidence," if "the logic of the inference is faulty," or "if the agency proceeds under an incorrect view of the law." *Id.*

## Discussion and Decision

The Unemployment Compensation Act requires employers to pay unemployment taxes for employees but does not require them to pay those taxes for independent contractors. I.C. §§ 22-4-10-1(a), -4-2, -8-1. The Act's ABC Test—so called because of its former statutory placement—presumes a worker is an employee unless an employer can establish three prongs:

> (1) The individual has been and will continue to be free from control and direction in connection with the performance of such service, both under the individual's contract of service and in fact.
>
> (2) The service is performed outside the usual course of the business for which the service is performed.
>
> (3) The individual:
>
>> (A) is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the service performed; or

> (B) is a sales agent who receives remuneration solely upon a commission basis and who is the master of the individual's own time and effort.

I.C. § 22-4-8-1(b). Finding that Q.D.-A. has established all three prongs, we hold that Driver was an independent contractor.

## A. Driver was not under Q.D.-A.'s control or direction.

First, to show that Driver was an independent contractor, Q.D.-A. must demonstrate it lacked control and direction over Driver, both under contract and in fact. *See* I.C. § 22-4-8-1(b)(1).

Under contract, Q.D.-A. and Driver "expressly understood and agreed" that Driver was an independent contractor. Ex. Vol. 3, p.16. This contract required Driver to provide all his own equipment and gave him ultimate control over how to complete his work. And the contract allowed Driver to provide drive-away services for any competitor and hire his own sub-contractors to complete his deliveries. Under contract, Q.D.-A. lacked control over Driver.

To show that it lacked control over Driver in fact, Q.D.-A. must show that it did not control the "'manner, method, and means'" in which he performed his services. *Circle Health Partners, Inc. v. Unemployment Ins. Appeals of Indiana Dep't of Workforce Dev.*, 47 N.E.3d 1239, 1243 (Ind. Ct. App. 2015) (quoting *Alumiwall Corp. v. Indiana Emp't Sec. Bd.*, 130 Ind. App. 535, 541, 167 N.E.2d 60, 62 (1960)). First, despite the Department arguing that Q.D.-A. controlled Driver because it required him to follow federal regulations, we agree with the United States Court of Appeals for the District of Columbia Circuit that "[g]overnment regulations constitute supervision not by the employer but by the state." *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. NLRB*, 603 F.2d 862, 875 (1978). The LALJ saw no evidence that the orientation or company policies went beyond echoing government regulations. Q.D.-A.'s Director of Administration testified that the purpose of the

orientation was "to go over the regulations brought on by the federal government" and the company policies merely reiterated "federal motor carrier regulations." Tr. Vol. 2, pp. 45, 46. The Department's sole witness, on the other hand, testified that she knew nothing about Q.D.-A.'s orientation or policies. Since Q.D.-A.'s orientation and policies merely relayed government regulations to Driver that he was already required to obey, Q.D.-A. did not control him by requiring him to follow them.

Independent of this government-regulation analysis, we hold Q.D.-A.'s control over Driver insufficient to form an employer-employee relationship because requiring work to be completed "in a good and workmanlike manner . . . is inherent in all services performed by one for another." *Alumiwall*, 130 Ind. App. at 541, 167 N.E.2d at 62. Q.D.-A. merely required Driver to complete his work in this competent manner by asking him to successfully complete the trips.

Q.D.-A. gave no guidance to Driver on how he should perform his work and never evaluated or monitored him. *See Twin States Pub. Co. v. Indiana Unemployment Ins. Bd.*, 678 N.E.2d 110, 114 (Ind. Ct. App. 1997) (holding that newspaper carriers were independent contractors when a publishing company required only that they "deliver the guides by 5:00 p.m. on Tuesdays" and "place the guides in a dry place"), *trans. denied. Cf. Circle Health*, 47 N.E.3d at 1245 (holding that health professionals were employees when they were given, in precise order and exacting detail, "eighteen specific steps to complete"); *Bloomington Area Arts Council v. Dep't of Workforce Dev., Unemployment Ins. Appeals*, 821 N.E.2d 843, 850–51 (Ind. Ct. App. 2005) (holding that instructors were employees when an art education center monitored teacher performance and required them to adhere to center-specific policies in its instructor's manual).

Driver could refuse jobs with no repercussions, work for as many drive-away companies as he wanted, negotiate his per-trip pay, and call in at his own convenience for jobs. *Cf. Circle Health*, 47 N.E.3d at 1245 (holding that health professionals were employees when they could not "conduct the screenings at times other than the hours scheduled for the screenings"); *Bloomington Area Arts Council*, 821 N.E.2d at 850–51 (holding that instructors were employees when an art education center decided if

and when to offer classes and expected teachers "to find and pay a substitute if one is necessary").

Driver also provided his own tools and equipment, paid for any incidental expenses, and could determine the payment and guidelines for any drivers he hired who qualified under federal regulations. *See Alumiwall*, 130 Ind. App. at 540–41, 167 N.E.2d at 62 (holding that siding installers were independent contractors when they "provided their own tools and equipment" and could "hire helpers and determine the wage scale of such helpers"). *Cf. Circle Health*, 47 N.E.3d at 1245 (holding that health professionals were employees when they could not "send others to complete the work").

In sum, Driver had total control over how—and even if—he completed his work. No evidence shows Q.D.-A., in fact, controlled Driver in a way that would make him an employee. Instead, as the Department's investigator herself contemplated, all these facts show the "opposite" of control.

Because all evidence showed that Driver, under contract and in fact, was free from Q.D.-A.'s direction and control, the LALJ's contrary conclusion was unreasonable.

## B. Driver performed a service outside Q.D.-A.'s usual course of business.

Second, for Q.D.-A. to establish that Driver was an independent contractor, it must show that he performed a service outside its usual course of business. *See* I.C. § 22-4-8-1(b)(2). With no Indiana case clearly defining "course of business," we adopt the definition applied by two of our sister states under their respective ABC Tests: "if an enterprise undertakes an activity, not as an isolated instance but as a regular or continuous practice, the activity will constitute part of the enterprise's usual course of business irrespective of its substantiality in relation to the other activities engaged in by the enterprise." *Appeal of Niadni, Inc.*, 93 A.3d 728, 732 (N.H. 2014) (alterations removed) (quoting *Mattatuck Museum v. Unemployment Comp.*, 679 A.2d 347, 351 (Conn. 1996)). In other

words, if a company regularly or continually performs an activity, no matter the scale, it is part of the company's usual course of business. And if a company regularly or continually performs activities showing it is "engaged in various separate and independent kinds of businesses or occupations," it may have more than one course of business. *Scott v. Rhoads*, 114 Ind. App. 150, 150, 51 N.E.2d 89, 91 (1943).

Consistent with this definition, our Court of Appeals in *Twin States* held that the "delivery of shopping guides" by newspaper carriers was outside a publishing company's usual course of business. 678 N.E.2d at 114. There, the company did not regularly or continually deliver shopping guides. Instead, that task was left exclusively to the carriers. And in *Bloomington Area Arts Council*, the instruction of art classes was within an art education center's usual course of business when it "regularly offer[ed] the art classes as part of its mission to provide access to the arts in the community." 821 N.E.2d at 852. Unlike the publishing company and newspaper carriers in *Twin States*, both the art education center and the teachers regularly or continually performed the same activity—providing art classes to the public.

Here, the parties agree that Driver provided drive-away services. So, to determine whether he performed a service within Q.D.-A.'s usual course of business, we need only decide if Q.D.-A. also provided drive-away services.

First, the Department argues that the way Q.D.-A. markets itself should factor into whether it provided drive-away services. But this marketing plays little, if any, direct role in analyzing the *activities* Q.D.-A. performs on a regular or continual basis. To be sure, advertising can reflect services a company offers to its customers. But we cannot uncritically rely on that advertising to fully reflect the activities a company regularly or continually performs.

Second, the Department argues that Q.D.-A.'s registration with the DOT shows it provided drive-away services. But federal law compels this registration for any "broker" who arranges motor carrier transportation between parties. 49 U.S.C. § 13904(a) (2012). *See also* 49 U.S.C. § 13102(2) (2008) (defining "broker" as "a person, other than a motor carrier or an

employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation"). As the Department's witness agreed, independent contractors across the United States often operate under the DOT registration of general contractors. In line with this national practice, Driver operated under Q.D.-A.'s DOT broker registration as an independent contractor. Altogether, no evidence shows Q.D.-A. regularly or continually provided drive-away services.

This conclusion, while consistent with *Twin States* and *Bloomington Area Arts Council*, directly conflicts with *Company*. In *Company*, a panel of our Court of Appeals held that transporting and delivering RVs was within the usual course of business of a company like Q.D.-A. 86 N.E.3d at 208. The *Company* panel—citing the company's DOT registration, the word "transport" in its corporate name, and its competition with companies offering the same services using employees—"seriously doubt[ed]" that customers contacted the company to act as a "middle man." *Id.* at 208–209. Instead, according to the panel's "common-sense standpoint," these customers would call the company to transport the RVs without caring how the company accomplished the task. *Id.* at 209. In other words, the panel supported its conclusion with speculative customer belief and facts not relevant to activities the company regularly or continually performed. By leaving the company's activities unexamined, *Company*'s reasoning did not answer the statutory question of whether its usual course of business included delivering RVs.

Because Q.D.-A. did not regularly or continually provide drive-away services, the LALJ unreasonably concluded that Driver performed a service within Q.D.-A.'s usual course of business.

## C. Driver ran an independently established business.

Third and finally, neither party disputes the LALJ's finding that Q.D.-A. "provided sufficient evidence to demonstrate that [Driver] was customarily engaged in an independently established trade, occupation, profession, or business of transporting commodities." Ex. Vol. 4, p.102. *See*

I.C. § 22-4-8-1(b)(3). So we assume Q.D.-A. meets this prong of the ABC Test.

# Conclusion

The LALJ unreasonably concluded that Driver was Q.D.-A.'s employee under the Unemployment Compensation Act when Driver (1) was not under Q.D.-A.'s control or direction, (2) performed a service outside Q.D.-A.'s usual course of business, and (3) ran an independently established business. We reverse.

Rush, C.J., and David and Goff, JJ., concur.
Slaughter, J., concurs in result.

ATTORNEYS FOR APPELLANT
Paul D. Borghesani
Angela N. Johnson
Andrew B. Murphy
Alexander E. Preller
Faegre Baker Daniels LLP
Indianapolis, Indiana
Minneapolis, Minnesota

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

Kian J. Hudson
Patricia C. McMath
Julia C. Payne
Andrea E. Rahman
Deputy Attorneys General
Indianapolis, Indiana